UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KYLE STEVEN WESTHOVEN,

        Petitioner,

    v.                                                  17-CV-1048
                                                    DECISION AND ORDER
COMMISSIONER OF SOCIAL
SECURITY,

        Respondent.

_____

On October 17, 2017, the plaintiff, Kyle Steven Westhoven, brought this action under the Social Security Act ("the Act"). He seeks review of the determination by the Commissioner of Social Security ("Commissioner") that he was not disabled. Docket Item 1. On June 29, 2018, Westhoven moved for judgment on the pleadings, Docket Item 18, and on August 24, 2018, the Commissioner responded and cross-moved for judgment on the pleadings, Docket Item 23. On September 19, 2018, Westhoven replied. Docket Item 24.

For the reasons stated below, this Court grants Westhoven's motion in part and denies the Commissioner's cross-motion.

# BACKGROUND

## I.    PROCEDURAL HISTORY

On August 22, 2013, Westhoven applied for disability benefits, Tr. 200.[1]  He claimed that he was disabled due to "Arnold-Chiari" malformation,[2] headaches, asthma, post traumatic stress disorder, anxiety, insomnia, substance abuse, and gastroesophageal reflux disease.  Tr. 113, 222.[3]

On October 16, 2013, Westhoven received notice that his application was denied because he was not disabled under the Act.  Tr. 109-15.  He requested a hearing before an administrative law judge ("ALJ"), Tr. 117, which was held on February 2, 2016, Tr. 36.  The ALJ then issued a decision on May 17, 2016, confirming the finding that Westhoven was not disabled.  Tr. 30.  Westhoven appealed the ALJ's decision, but his appeal was denied, and the decision then became final.  Tr. 1-4.

---

[1] "Tr." citations are to pages in the administrative record filed with the Commissioner's answer, Docket Items 12, 17.

[2] Chiari malformations are a "group of disorders where the cerebellum extends below the opening of the spinal canal (the foramen magnum)."  SALEM HEALTH MAGILL'S MEDICAL GUIDE SIXTH ED. Vol. I, at 551.  An "Arnold-Chiari malformation[] is considered the classic Chiari malformation."  *Id.*  "In this type, both the cerebellum and part of the brain stem are pushed into the foramen magnum."  *Id.*  "Headaches, neck pain, balance problems, numbness in the arms and legs are the symptoms that result from the pressure on nerves caused by the herniation of the cerebellum into the foramen magnum; the symptoms may come and go."  *Id.*

[3] The ALJ stated that Westhoven alleged a disability onset date of March 11, 2013.  Tr. 18.  In his memorandum of law in support of his motion for judgment on the pleadings, Westhoven also notes a disability onset date of March 11, 2013.  But Westhoven's Form SSA 3367, completed by a Social Security Administration Field Office, indicates that he alleged a disability onset date of May 30, 2013.  Tr. 218.

## II.     RELEVANT MEDICAL EVIDENCE

The following summarizes the medical evidence most relevant to Westhoven's objection.  Westhoven was examined by several different providers, but only five—Mary Obear, M.D., a family medicine doctor; Adam Brownfield, Ph.D, a psychologist; Nikita Dave, M.D., a physical medicine and rehabilitation doctor; H. Tzetzo, a state agency mental health clinician; and Kalyan Shastri, M.D., a physician at the Dent Neurologic Institute—are of most significance to this Court's review of his disability determination.

### A.     Mary Obear, M.D., a Family Medicine Physician

Between October 2013 and July 2014, Westhoven was treated and evaluated numerous times by Dr. Obear, a family medicine physician.  Tr. 1013-45.  In fact, Westhoven was a long-time patient of Dr. Obear, who had seen Westhoven since 2000.  Tr. 1185.  Sometimes, Dr. Obear's findings indicated that Westhoven suffered from significant anxiety and posttraumatic stress disorder, *see, e.g.,* Tr. 1032; but sometimes, her findings indicated that Westhoven's mental impairments were more limited.

On July 2, 2016, however, Dr. Obear wrote a comprehensive letter detailing her findings and opining about those findings.  Tr. 1185.  She explained the extent to which Westhoven suffers from posttraumatic stress disorder, "not just from his childhood experiences but also from adult experiences with health issues."  She noted that Westhoven had been diagnosed "with severe anxiety" beginning as a child.  In light of this condition, "school environment was too stressful," and he had to leave school and instead obtain a GED.  His "frequent headaches . . . incapacitated him" and left him "unable to maintain a regular schedule" at his job as a cashier, so he became "unable to work."

> His symptoms included photophobia, nausea/vomiting, severe head pain, incoordination and rapid decompensation. These episodes were correlated with physical activity and worsened after he moved from a cashier position to stocking shelves. The activities that provoke his symptoms are varied and include[] bending, straining, coughing and sneezing. . . and sexual activity.

*Id.*

Although Westhoven had decompression surgery to deal with his Chiari malformation in 2009, that surgery "did not stop his headaches nor his incoordination, memory loss, or general disability." *Id.* "Recently he has developed bladder and bowel incontinence and weakness in his right lower leg that gives way unexpectedly causing him to fall." In 2013, Westhoven "suffered a head injury . . . that led to more frequent headaches and the new onset of vertigo." In 2014, he "developed lower leg edema and pain." He was diagnosed with "deep vein thrombosis and placed on anticoagulation therapy." *Id.*

Dr. Obear opined that Westhoven had been unable to work since he filed for disability benefits in 2013. Tr. 1186.

> He continues to have daily pain, weakness and incoordination. He is using a quad cane for stability and to avoid falling. He continues to have periodic incontinence of bowel and bladder which is embarrassing and distressing . . . . He cannot lift or carry 10 pounds, he is unable to sit for 6 hours or stand/walk for 6 hours in an 8 hour day. He is unable to live independently and relies on his family for help in his care. It is incredibly unrealistic to expect [Westhoven] to work in any position. He has unpredictable symptoms that come on with no warning and they debilitate him in a matter of minutes. Consequently his anxiety is severe. He is prescribed anti-anxiety medications that only partially ameliorate his symptoms. He continues in counseling on a regular basis.

*Id.*

Dr. Obear concluded that it is

impossible for Kyle Westhoven to work in any capacity at this time nor is it likely that he will be able to in the future. He has been told by neurosurgery

that there is nothing further that they can offer him in terms of surgical intervention. He is focusing on symptom control and anxiety reduction but has a long road ahead of him. He is sincere in his desire to be a productive member of society but his physical and psychological limitations prevent it at this time.

*Id.*

### B.    Adam Brownfield, Ph.D, a Psychologist

On October 9, 2013, Westhoven was evaluated by Dr. Brownfield, a consultative psychologist. Tr. 1000-04. Dr. Brownfield diagnosed Westhoven with posttraumatic stress disorder; panic disorder without agoraphobia; major depressive disorder, moderate; cognitive disorder, secondary to Arnold-Chiari malformation; insomnia; Arnold-Chiari malformation; asthma; and gastroesophageal reflux disease. Tr. 1003-04.

Dr. Brownfield explained that

There is no evidence of limitation in following and understanding simple directions and instructions, performing simple tasks independently, maintaining attention and concentration, making appropriate decisions, or relating adequately with others. [Westhoven] is moderately to markedly limited in maintaining a regular schedule, learning new tasks, performing complex tasks independently, and would require supervision, and appropriately dealing with stress. These difficulties are caused by cognitive and psychiatric defects.

Tr. 1003. Dr. Brownfield also found that Westhoven "will need assistance in managing funds due to cognitive deficits and his mother is assisting now." Tr. 1004.

### C.    Nikita Dave, M.D., a Physical Medicine and Rehabilitation Physician

On October 9, 2013, Westhoven was evaluated by Dr. Dave, a consultative physician. Tr. 1005-09. Dr. Dave diagnosed Westhoven with Arnold-Chiari malformation type 1, status post decompression surgery in 2009; frequent loss of balance, unsteadiness; neck pain; severe headaches, due to Arnold-Chiari; asthma,

chronic obstructive pulmonary disease; use of suboxone; posttraumatic stress disorder, anxiety, insomnia, poor memory; and gastroesophageal reflux disease. Tr. 1009. Dr. Dave found that Westhoven

> should not lift, carry, push, or pull greater than lightly to moderately weighted objects. There are moderate to marked limitations for activities requiring sustained exertion, endurance, or very strenuous physical activity through the day. [Westhoven] may benefit from sedentary-types of activities. Moderate to marked limitations for all activity during acute/severe bouts of headache, likely to be transient over a day or so. [Westhoven] should avoid smoke, dust, fumes, inhalants, chemicals, outdoor allergens, extremes of heat, cold, and humidity, due to asthma.

Tr. 1009.

### D. H. Tzetzo

On October 15, 2013, H. Tzetzo,[4] a state agency mental health clinician, completed a medical evaluation regarding Westhoven. Tr. 1010. Tzetzo also completed a mental residual functional capacity assessment regarding Westhoven. Tr. 96-98. He indicated that Westhoven had mild limitations in maintaining the activities of daily living; moderate limitations in maintaining social functioning; and moderate limitations in maintaining concentration, persistence, or pace. *Id*.

### E. Kalyan Shastri, M.D., a physician at the Dent Neurologic Institute

On November 19, 2013, Kalyan Shastri, M.D., a physician at Dent, examined Westhoven and concluded that he suffered from headaches, cervicalgia, posttraumatic stress disorder, and anxiety. Tr. 1040.

---

[4] The record is silent as to the academic credentials or full name of H. Tzetzo.

### III.    THE ALJ'S DECISION

In denying Westhoven's application, the ALJ evaluated Westhoven's claim under the Social Security Administration's five-step evaluation process for disability determinations.  *See* 20 C.F.R. § 404.1520.  At the first step, the ALJ must determine whether the claimant is currently engaged in substantial gainful employment. § 404.1520(a)(4)(i).  If so, the claimant is not disabled.  *Id.*  If not, the ALJ proceeds to step two.  § 404.1520(a)(4).

At step two, the ALJ decides whether the claimant is suffering from any severe impairments.  § 404.1520(a)(4)(ii).  If there are no severe impairments, the claimant is not disabled.  *Id.*  If there are any severe impairments, the ALJ proceeds to step three. § 404.1520(a)(4).

At step three, the ALJ determines whether any severe impairment or impairments meet or equal an impairment listed in the regulations.  § 404.1520(a)(4)(iii).  If the claimant's severe impairment or impairments meet or equal one listed in the regulations, the claimant is disabled.  *Id.*  But if the ALJ finds that none of the severe impairments meet any of the regulations, the ALJ proceeds to step four.  § 404.1520(a)(4).

As part of step four, the ALJ first determines the claimant's residual functional capacity ("RFC").  *See* §§ 404.1520(a)(4)(iv); 404.1520(d)-(e).  The RFC is a holistic assessment of the claimant—addressing both severe and nonsevere medical impairments—that evaluates whether the claimant can perform past relevant work or other work in the national economy.  *See* 20 C.F.R. § 404.1545.

After determining the claimant's RFC, the ALJ completes step four.  20 C.F.R. § 404.1520(e).  If a claimant can perform past relevant work, he or she is not disabled

and the analysis ends.  § 404.1520(f).  But if the claimant cannot, the ALJ proceeds to step five.  20 C.F.R. §§ 404.1520(a)(4)(iv); 404.1520(f).

In the fifth and final step, the Commissioner must present evidence showing that the claimant is not disabled because the claimant is physically and mentally capable of adjusting to an alternative job.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. § 404.1520(a)(v), (g).  More specifically, the Commissioner bears the burden of proving that a claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy."  *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

In this case, the ALJ determined at step one that Westhoven had not engaged in "substantial gainful activity" since March 11, 2013.  Tr. 20.  At step two, the ALJ found that Westhoven had the following severe impairments: "Arnold-Chiari Malformation; Anxiety; Post-Traumatic Stress Disorder; Opioid Dependence; Gastroesophageal Reflux Disease; and Headaches."  *Id.*  At step three, the ALJ determined that these severe impairments did not meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 21.

In assessing Westhoven's RFC, the ALJ determined that Westhoven could

> lift/carry 10 pounds, sit for 6 hours in an 8-hour workday, and stand/walk for 2 hours in an 8-hour workday.  The claimant has occasional limitations in pushing/pulling with the upper extremities.  He has occasional limitations in bending, climbing, stooping, squatting, kneeling and crawling.  He cannot climb ropes, ladders or scaffolds, work in areas with unprotected heights, or work around heavy, moving or dangerous machinery.  He cannot work in areas where she [sic] would be exposed to cold, temperature extremes, or humidity.  The claimant has occasional limitations in the ability to understand, remember and carry out detailed instructions, the ability to respond appropriately to changes in a work setting, and the ability to appropriately deal with stress.

Tr. 22.

The ALJ explicitly analyzed the opinions of Dr. Brownfield, Dr. Dave, and Clinician Tzetzo. Tr. 24-25. The ALJ gave Dr. Brownfield's opinion "little weight" because it was "inconsistent with his good prognosis and not supported by the normal medical examinations in Exhibit 12F."[5] Tr. 24. The ALJ gave Dr. Dave's opinion "little weight . . . as it is not supported by the normal medical examinations in Exhibits 12F, 15F, and 16F." *Id.* He gave Clinician Tzetzo's evaluation "little weight, as it was derived solely from a document review without the benefit of examining [Westhoven], and it is not supported by multiple medical examinations in Exhibit 12F that were within normal limits." Tr. 25.

Regarding "[t]he remainder of the medical evidence in the record," the ALJ "briefly discussed" it "in a roughly chronological manner for purposes of complete review of the record." Tr. 25. Nevertheless, the ALJ appears to have discounted the rest of the medical evidence because it was "not couched in vocationally-relevant terms." *Id.* Specifically as to long-term treating provider Dr. Obear's records, the ALJ noted that "[t]here were various and sundry medical examinations from Pembroke which indicate 'WNL' as 'within normal limits' on" a number of dates. Tr. 25-26.

At step four, the ALJ determined that Westhoven "is unable to perform any past relevant work." Tr. 28. Finally, at step five, the ALJ determined that "[c]onsidering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that [he] can perform." Tr. 29. Specifically,

---

[5] Exhibit 12F can be found at Tr. 1013-56, and it consists of Westhoven's medical records from Pembroke Family Medicine—primarily from Dr. Obear. *Id.*

the ALJ determined that Westhoven can work as a "Document Preparer" or an "Addresser." *Id.*

## IV. SUBSEQUENT PROCEDURAL HISTORY AND EVIDENCE

After the ALJ issued his decision, Westhoven submitted Dr. Obear's letter, described in detail above, explaining Westhoven's medical records from her office and opining about Westhoven's impairments. Tr. 2, 1185-86. Despite that comprehensive letter, the Appeals Council denied Westhoven's request for review. Tr. 1. It found that there was not "a reasonable probability that [Dr. Obear's letter] would change the outcome of the decision." Tr. 2. Therefore, the Appeals Council "did not consider and exhibit [sic] this evidence." *Id.*

## **LEGAL STANDARDS**

## I. DISTRICT COURT REVIEW

When evaluating a decision by the Commissioner, district courts have a narrow scope of review: they are to determine whether the Commissioner's conclusions are supported by substantial evidence in the record and whether the Commissioner applied the appropriate legal standards. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). Indeed, a district court ***must*** accept the Commissioner's findings of fact if they are supported by substantial evidence in the record. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla and includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). In other words, a district court does not review a disability determination de novo. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

## DISCUSSION

### I.    ALLEGATIONS

Westhoven objects to the Appeals Council's failure to consider Dr. Obear's letter. Docket Item 18-1 at 22-24. Westhoven also argues that the ALJ and Appeals Council findings that Westhoven could perform sedentary work on an ongoing and consistent basis were not supported by substantial evidence. *Id.* at 25-30. For these reasons, Westhoven asserts that remand is required.

### II.    ANALYSIS

"If the Appeals Council denies review of a case, the ALJ's decision, and not the Appeals Council's, is the final agency decision." *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015). But in *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996), the Second Circuit joined the majority of circuits to conclude that "[n]ew evidence submitted to the Appeals Council becomes part of the administrative record for purposes of judicial review when the Council denies review." Because the Appeals Council denied review here, this Court's "review focuses on the ALJ's decision," *Lesterhuis*, 805 F.3d at 87; but in light of *Perez*, this Court's review must and will include the new evidence submitted to the Appeals Council—that is, Dr. Obear's letter. *See id.*; *Perez*, 77 F.3d at 45.

In *Lesterhuis v. Colvin*, the Second Circuit vacated and remanded an ALJ's decision in a context similar to that in this case. 805 F.3d at 87-89. In *Lesterhuis*, as in this case, the claimant asked the Court to consider whether an ALJ's decision was unsupported by substantial evidence in light of new and material evidence submitted to the Appeals Council, which denied review. *See id.* The record before the ALJ included a medical opinion from two treating physicians, an examiner for the workers'

compensation carrier, two consultative examiners, and a vocational expert. *Id.* at 85. After the ALJ issued a decision denying the claim, the claimant submitted the medical opinion of a third treating physician as part of his request for review with the Appeals Council. *Id.* at 86. The Appeals Council denied review, and the claimant appealed. *Id.* The Second Circuit determined that the ALJ's decision was "not supported by substantial evidence because the new evidence contradicted the ALJ's conclusion in important respects." *Id.* at 88.

Guided by *Lesterhuis*, this Court agrees with Westhoven that the ALJ's decision was not supported by substantial evidence—especially in light of the new evidence from Dr. Obear. Dr. Obear "is a treating physician who provided an opinion that is (1) generally entitled to controlling weight, (2) likely dispositive on the issue of disability (if entitled to controlling weight), and (3) uncontroverted by other evidence in the record." *Id.* at 88. Her letter, added to the record after the ALJ's decision, opined that Westhoven "is unable to live independently and relies on his family for help in his care." Tr. 1186. "It is incredibly unrealistic to expect [Westhoven] to work in any position," she wrote. *Id.* "He has unpredictable symptoms that come on with no warning and they debilitate him in a matter of minutes." *Id.* "Consequently his anxiety is severe." *Id.* "He is prescribed anti-anxiety medications that only partially ameliorate his symptoms." *Id.*

As a result, it is

impossible for Kyle Westhoven to work in any capacity at this time nor is it likely that he will be able to in the future. He has been told by neurosurgery that there is nothing further that they can offer him in terms of surgical intervention. He is focusing on symptom control and anxiety reduction but has a long road ahead of him. He is sincere in his desire to be a productive member of society but his physical and psychological limitations prevent it at this time.

*Id.*

Because Dr. Obear is a treating physician, "SSA regulations give [her] opinions 'controlling weight' so long as they are 'well-supported by medically acceptable techniques and are not inconsistent with the other substantial evidence in the record." *Lesterhuis*, 805 F.3d at 88 (quoting 20 C.F.R. § 404.1527(c)(2)). Therefore, it is hard to understand how Westhoven might not be disabled in light of Dr. Obear's letter—a comprehensive analysis by a long-time treating source explaining what her records and the records of other providers say about Westhoven's conditions and abilities. For that reason, it is even harder to understand why the Appeals Council might deny review in the face of such a compelling opinion. Nevertheless, because the ALJ did not have the benefit of Dr. Obear's letter in reaching his decision—and because neither the ALJ nor the Appeals Council is compelled to accept Dr. Obear's opinion, *see id.*—this Court remands for further reconsideration by the ALJ rather than reversing the ALJ's decision and remanding for calculation of benefits.

Moreover, even if Dr. Obear had not written her letter, this Court still would have remanded the ALJ's decision. The ALJ analyzed only the opinions of Dr. Brownfield, Dr. Dave, and Clinician Tzetzo. Tr. 24-25. He gave "little weight" to Dr. Brownfield's opinion because it was "not supported by the normal medical examinations in Exhibit 12F," Tr. 24, which consists primarily of Dr. Obear's medical records. Tr. 1013-56. Likewise, he gave "little weight" to Dr. Dave's opinions because they were "not supported by the normal medical examinations in Exhibits 12F, 15F and 16F." Tr. 24. And he gave "little weight" to the opinion of Clinician Tzetzo because "it was derived solely from a document without the benefit of examining the claimant, and it is not

supported by multiple medical examinations in Exhibit 12F that were within normal limits." Tr. 25.

But it is far from clear what the ALJ meant by "normal" in Exhibit 12F or to what the ALJ was referring. The ALJ did explicitly discuss "Exhibit 12F" later in his decision, and he asserted that "various and sundry medical examinations from Pembroke . . . indicate 'WNL' as 'within normal limits' on" a number of dates. Tr. 25-26. But this Court has reviewed those records and does not see what the ALJ apparently saw. The ALJ "was required to provide 'an accurate and logical bridge' between the evidence and his conclusions." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The fact that the "normal" findings on which he relied are not apparent even after a careful review of the record is reason alone to remand for an accurate explanation of why the ALJ assigned the weight he did to the opinions of Dr. Brownfield, Dr. Dave, and Clinician Tzetzo.

Finally, "[a]lthough the ALJ was not required to mention every piece of evidence, providing 'an accurate and logical bridge' required [the ALJ] to confront the evidence in [Westhoven's] favor and explain why it was rejected before concluding that [his] impairments did not impose more than a minimal limitation on [his] ability to perform basic work tasks." *Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016) (quoting *Roddy*, 705 F.3d at 636). The ALJ did not do that here. Instead, after analyzing the opinions of Dr. Brownfield, Dr. Dave, and Clinician Tzetzo, the ALJ opted to give short shrift to everything else: "The remainder of the medical evidence in the record is not couched in vocationally-relevant terms, but is briefly discussed hereinbelow, in a roughly chronological manner, for purposes of complete review of the record." Tr. 25. True to

his word, the ALJ then summarized the rest of the evidence in a roughly chronological manner. But he did not analyze how it supports his conclusion that Westhoven is not disabled.[6]

## **CONCLUSION**

For the reasons stated above, the Commissioner's motion for judgment on the pleadings, Docket Item 23, is DENIED, and Westhoven's motion for judgment on the pleadings, Docket Item 18, is GRANTED in part and DENIED in part. The decision of the Commissioner is VACATED, and the matter is REMANDED for further administrative proceedings consistent with this decision.

SO ORDERED.

Dated:     April 8, 2019
             Buffalo, New York


  _s/ Lawrence J. Vilardo_
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE

---

[6] Because the "remaining issues . . . may be affected by the ALJ's treatment of this case on remand," this Court does not reach them. *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).